[Cite as *Smith v. Frederick C. Smith Clinic*, 189 Ohio App.3d 473, 2010-Ohio-4548.]


# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY


SMITH, EXR.,                                        CASE NO. 9-09-50

    APPELLANT,

  v.

FREDERICK C. SMITH                        O P I N I O N
CLINIC ET AL.,

    APPELLEES.


**Appeal from Marion County Common Pleas Court
Trial Court No. 08 CV 0124**

**Judgment Reversed and Cause Remanded**

**Date of Decision:  September 27, 2010**


APPEARANCES:

    **Robert E. Wilson, for appellant.**

    **James P. Myers, for appellees.**


    SHAW, Judge.

**{¶ 1}** Plaintiff-appellant, Randy Smith, executor of the estate of Martha Smith, deceased, appeals the judgment of the Common Pleas Court of Marion County, Ohio, granting summary judgment in favor of defendants-appellees, The Frederick C. Smith Clinic and Clinic Investment L.L.C. ("the clinic") and dismissing his complaint against them.

**{¶ 2}** On April 20, 2004, Martha was entering the clinic, aided by the use of a cane, when she was knocked down by the automatic sliding doors at the main entrance while in the threshold of the doors. Gayle Hayman, who had witnessed the incident, waited with Martha until employees of the clinic arrived and placed Martha on a stretcher and removed her from the scene. As a result of this incident, Martha suffered a broken elbow.

**{¶ 3}** Martha filed a complaint in the Marion County Common Pleas Court on March 7, 2006, against the clinic and "John Doe No. 1 Corporation and John Doe No. 2 Individual" for the injuries she sustained from the accident. On June 15, 2005, Martha died from causes unrelated to the injuries she sustained in this matter, and, on July 15, 2005, her son, Randy, was appointed executor of her estate.

**{¶ 4}** On February 15, 2007, the complaint was voluntarily dismissed pursuant to Civ.R. 41(A)(2). On February 8, 2008, Randy, as executor, refiled the complaint against the clinic and The Stanley Works, Stanley Access Technologies,

and Stanley Magic-Door, Inc. ("Stanley"), the manufacturer and provider of preventative maintenance for the doors by contract.

{¶ 5} On February 25, 2008, and April 7, 2008, respectively, the clinic and Stanley filed their answers. Thereafter, on June 20, 2008, and July 24, 2008, respectively, the clinic and Stanley filed motions for summary judgment. On February 10, 2009, Randy filed a response to the clinic's motion, but on February 12, 2009, Randy voluntarily dismissed Stanley. On February 27, 2009, the clinic filed a reply and memorandum in support of its motion for summary judgment.

{¶ 6} On October 16, 2009, the trial court granted the clinic's motion for summary judgment, finding that the automatic sliding doors were an open and obvious danger for which the clinic owed no duty to warn Martha. On November 12, 2009, the trial court filed a journal entry dismissing the action with prejudice.

{¶ 7} This appeal followed, and Randy now asserts two assignments of error.

### ASSIGNMENT OF ERROR I

The trial court failed to apply the doctrine of res ipsa loquitur to the premature closing of the automatic sliding glass doors which caused injury to the plaintiff which would defeat defendants' motion for summary judgment.

### ASSIGNMENT OF ERROR II

There is a question of fact of whether a business owner is negligent when the owner of the business has previously been advised that its automatic sliding glass doors prematurely closed on

a business invitee and fails to remedy that hazard which causes an injury to a subsequent business invitee.

{¶ 8}   For ease of discussion, we elect to address these assignments of error out of the order in which they appear.

*Second Assignment of Error*

{¶ 9}   In Randy's second assignment of error, he contends that the trial court erred in granting summary judgment in favor of the clinic because there was a genuine issue of material fact as to whether the clinic breached the duty of care it owed to Martha based upon its failure to provide a warning about not stopping on the threshold, its creation of the hazard, and its failure to remedy the hazard after it existed for 19 months.

{¶ 10} An appellate court reviews a grant of summary judgment de novo, without any deference to the trial court. *Conley-Slowinski v. Superior Spinning & Stamping Co.* (1998), 128 Ohio App.3d 360, 363, 714 N.E.2d 991; see also *Hasenfratz v. Warnement*, 3d Dist. No. 1-06-03, 2006-Ohio-2797, citing *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 572 N.E.2d 198.  A grant of summary judgment will be affirmed only when the requirements of Civ.R. 56(C) are met.  Summary judgment requires the moving party to establish the following:

> [W]hen, looking at the evidence as a whole, (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence, construed most strongly in favor of the nonmoving party,

that reasonable minds could only conclude in favor of the moving party.

*Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. See also Civ.R. 56(C).

{¶ 11} The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 526 N.E.2d 798, syllabus. The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264. Once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the nonmoving party to produce evidence on any issue about which that party bears the burden of production at trial. See Civ.R. 56(E).

{¶ 12} In ruling on a summary-judgment motion, a court is not permitted to weigh evidence or choose among reasonable inferences; rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the nonmoving party. *Jacobs v. Racevskis* (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653. Additionally, Civ.R.56(C) mandates that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written

stipulations of fact show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

{¶ 13} To prevail in a negligence action, a plaintiff must demonstrate that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused the plaintiff to be injured. (Citations omitted.) *Lang v. Holly Hill Motel, Inc.*, 122 Ohio St.3d 120, 2009-Ohio-2495, 909 N.E.2d 120, at ¶ 10. The applicable duty is determined by the relationship between the landowner and the plaintiff when the alleged negligence occurs in a premises-liability context. Id., citing *Gladon v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 315, 662 N.E.2d 287. Here, the parties do not dispute that Martha was a business invitee of the clinic.

{¶ 14} "A shopkeeper ordinarily owes its business invitees a duty of ordinary care in maintaining the premises in a reasonably safe condition and has the duty to warn its invitees of latent or hidden dangers." *Armstrong v. Best Buy Co., Inc.*, 99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088, at ¶ 5, citing *Paschal v. Rite Aid Pharmacy, Inc.* (1985), 18 Ohio St.3d 203, 480 N.E.2d 474; *Jackson v. Kings Island* (1979), 58 Ohio St.2d 357, 390 N.E.2d 810. In a premises-liability action, the plaintiff can prove the defendant's breach of duty if any one of three conditions is satisfied:

[T]he defendant, through its officers or employees, was responsible for the hazard complained of; (2) at least one of such persons had actual knowledge of the hazard and neglected to give adequate notice of its presence or to remove it promptly; or (3) such danger existed for a sufficient length of time reasonably to justify the inference that the failure to warn against it or remove it was attributable to a want of ordinary care.

*Gouhin v. Giant Eagle*, 10th Dist. No. 07AP-548, 2008-Ohio-766, at ¶ 8, citing *Sharp v. Anderson's, Inc.*, 10th Dist. No. 06AP81, 2006-Ohio-4075, at ¶ 7, citing *Johnson v. Wagner Provision Co.* (1943), 141 Ohio St. 584, 589, 49 N.E.2d 925. Further, "[w]hen it is shown that the owner had superior knowledge of the particular danger which caused the injury, liability attaches because, in such a case, invitees may not reasonably be expected to protect themselves from a risk they cannot fully appreciate." *Hairston v. Gary K. Corp.*, 8th Dist. No. 87199, 2006-Ohio-5566, at ¶ 10, citing *Mikula v. Slavin Tailors* (1970), 24 Ohio St.2d 48, 263 N.E.2d 316; *LaCourse v. Fleitz* (1986), 28 Ohio St.3d 209, 503 N.E.2d 159; see also *Cochran v. Ohio Auto Club* (Oct. 3, 1996), 3d Dist. No. 9-96-33, 1996 WL 562055.

{¶ 15} Moreover:

In *Perry v. Eastgreen Realty Co.* (1978), 53 Ohio St.2d 51, a per curiam opinion, at pages 52 and 53, it is stated: "[O]nce the evidence establishes that a dangerous condition existed, and that it is a condition about which the owner should have known, evidence of actual knowledge on his part is unnecessary.

" 'The occupier is not an insurer of the safety of invitees, and his duty is only to exercise reasonable care for their protection. But the obligation of reasonable care is a full one, applicable in all respects, and extending to everything that threatens the invitee with

-7-

an unreasonable risk of harm. The occupier must not only use care not to injure the visitor by negligent activities, and warn him of latent dangers of which the occupier knows, but he must also inspect the premises to discover possible dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use. The obligation extends to the original construction of the premises, where it results in a dangerous condition.' Prosser on Torts (4 Ed.), 392-93 (1971). See, also, *Peaster v. William Sikes Post No. 4825 V.F.W.* (1966), 113 Ga.App. 211, 147 S.E.2d 686, 687-8; *De Weese v. J.C. Penney Co.* (1956), 5 Utah 2d 116, 297 P.2d 898, 901; *Gallagher v. St. Raymond's Roman Catholic Church* (1968), 21 N.Y.2d 554, 236 N.E.2d 632, 633-34 (so changing the pre-existing common law as to require outdoor lighting where none had been requisite); *F.W. Woolworth Co. v. Bland* (1933), 22 Ohio Law Abs. 660, 660-61; 39 Ohio Jurisprudence 2d 586-87, Negligence, Section 64."

*Vondenhuevel v. Overhead Door Corp.* (Apr. 26, 1988), 3d Dist. No. 1-86-23, 1988 WL 40434, 1.

{¶ 16} In the case sub judice, Randy maintains that the clinic was responsible for the hazard, i.e., the doors closing while a person was in the threshold, because it had no policies and procedures for implementing the daily safety checklist provided to it by Stanley Access Technologies, the company that serviced the doors at the clinic, and had no method by which it documented which employee implemented the checklist on any particular day. In addition, Randy asserts that the clinic was responsible for the hazard because it determined the length of time the doors would remain open before the doors automatically closed and because it was informed by a Stanley technician that the OmniScan sensor that

operated the opening and closing of the doors was obsolete and should be upgraded.

{¶ 17} We find that Randy's assertion regarding the clinic's control of the length of time the doors would remain open before automatically closing has merit. First, Rich Cole, a supervisor for Stanley, testified about the operation of various sensors. For instance, Cole testified that one type of threshold sensor, referred to as the "Stan-Guard," "looks straight down from the bottom of the header across the opening of the door to make sure that there's nobody standing in the opening of the door." However, this sensor has a blind spot because of its limited width, and if there is no movement in the threshold for a certain period of time, the sensor will "time-out," resulting in the doors closing. Cole testified that the timer on the Stan-Guard is determined by the customer and can be set to time-out from anywhere between 30 seconds and three minutes. He further testified that because of the Stan-Guard's limitations, a redundant threshold sensor, referred to as a "holding beam," is often used in the sides of the doorway so the door will not close on someone who is in the threshold. Although Cole was unfamiliar with the OmniScan sensor and how it operated, his testimony reveals that there are numerous options available to customers and that it is the customer who chooses the door and the safety mechanisms that will be installed. Further, a Stanley technician recommended in June 2003 that the OmniScan sensors be upgraded. Although this recommendation was made based upon the sensors' being obsolete

rather than because they were not working, the fact that the technician was making a *recommendation* to the clinic to upgrade demonstrates that the choice of sensors was the clinic's, rather than the service provider's. Thus, the clinic determined what safety devices would be utilized.

{¶ 18} Second, the testimony of Ralph Neddleton, the Facilities Director for the clinic, revealed that the clinic chose what company would maintain these doors and when the doors would be serviced. Further, the clinic knew in September 2002 that another incident similar to Martha's had occurred when Lee Ann Murraya, who was using a walker, was knocked down by the same doors as she was entering the clinic. Once the clinic knew this type of incident could happen, it alone had the power to determine whether to have new sensors installed to accommodate the types of invitees that frequented its establishment. In the alternative, if possible on the current sensors, it could have lengthened the amount of time before the doors would time-out or it could have adjusted the sensors that detected whether someone/something was in the pathway of the doors to ensure that the doors would not close if someone was in the threshold.

{¶ 19} When construing this evidence in a light most favorable to Randy, we find that a genuine issue of material fact exists as to whether the clinic created this hazard by failing to choose adequate safety measures or otherwise warning its invitees about the length of time they had to safely traverse the threshold.

{¶ 20} Randy also maintains that the clinic had actual knowledge of the hazard and neglected to give adequate notice of its presence or to remove it promptly. In support of his position, Randy relies upon the previously noted prior occurrence of a similar incident involving these doors.

{¶ 21} In this incident, the affidavit of Lee Ann Murraya stated that she was injured at the clinic on September 23, 2002. More specifically, Murraya averred that she was entering the clinic through the automatic sliding doors at the main entrance with the aid of her walker when the doors started to close on her. She attempted to stop the doors but was unable to do so. The doors then knocked her to the ground. This fall resulted in a broken finger on her right hand. Murraya further stated that she was immediately taken by wheelchair to a receptionist, where she checked in for her doctor's appointment. She told the receptionist about her fall and completed an incident report. Four days later, Murraya was contacted by a claims specialist from the clinic's insurance company, and her claim was later settled out of court.

{¶ 22} When viewed in a light most favorable to Randy, this evidence reveals that the clinic was aware of a prior incident in which a woman, who was unable to walk without assistance, was injured while in the threshold of these sets of doors. Yet there is no evidence that the clinic took any steps to alleviate this problem after the first incident. While the evidence shows that Stanley conducted routine preventive maintenance on these doors in March and June 2003 and the

doors were functioning properly and within ANSI[1] standards, there is nothing to indicate that anyone attempted to determine at any point after Murraya's fall how long a person could remain in the threshold before the doors would close.

{¶ 23} Further, the record is devoid of any evidence that steps were taken by the clinic to ensure that disabled persons entering the clinic, who require more time to walk through a doorway than the average nondisabled person, could safely traverse through the doors. Notably, this is a medical clinic, catering to the needs of those who may be ill, injured, and/or disabled. Although the doors may be operating properly and the time-out setting is satisfactory for the average person using those doors, the clinic was aware that a previous invitee who had to use assistance in order to walk was struck and injured by these doors. At that point, reasonable minds could conclude that the clinic should have pursued one of two options: (1) remedy this problem by installing better sensors that could detect whether an object was in the threshold, even if that object was immobile, so that the doors would either not begin to close or not continue to close while someone/something was in the path of these doors, or (2) place some sort of notice in a location easily observed by those entering and exiting these doors, warning people to use caution and notifying them that the doors automatically close in "x" amount of time. Given this evidence, we find that a genuine issue of material fact

---

[1] ANSI is the acronym for the American National Standards Institute.

existed as to whether the clinic had actual knowledge of the hazard and neglected to give adequate notice of its presence or to remove it promptly.

{¶ 24} In addition, the clinic was made aware of this incident on September 23, 2002, some 19 months prior to Martha's accident. However, the record reveals only two times that the doors were inspected, and neither of these indicates that the clinic ever attempted to evaluate whether it needed to obtain more sensitive sensors or install sensors that could detect when someone/something was in the threshold, whether that person was mobile or stationary. Accordingly, reasonable minds could conclude that this hazard existed for a sufficient length of time, i.e., 19 months, to reasonably justify the inference that the failure to warn against it or remove it was attributable to a want of ordinary care. Thus, there is a genuine issue of material fact as to this issue as well.

{¶ 25} Lastly, a genuine issue of material fact exists as to whether the clinic failed to take reasonable precautions to protect the invitee, Martha, from dangers that were foreseeable from the arrangement or use of these doors. As previously noted, this obligation extends to the original installation of these doors when it results in a dangerous condition. See *Perry*, 53 Ohio St.2d at 53, 372 N.E.2d 335. Therefore, even if this prior incident had not occurred, the clinic should have taken reasonable precautions to protect its invitees, who undoubtedly included disabled and ill persons and oftentimes require more time to walk through a doorway than

the average nondisabled person, by equipping its doors with protection devices to prevent closure in the event that someone is in the threshold of the door.

{¶ 26} In light of the evidence, and construing all of the evidence in a light most favorable to Randy, we find that there exists a genuine issue of material fact as to whether the clinic breached its duty of care to Martha, and the trial court erred in finding otherwise. Nevertheless, the clinic asserts that it did not owe Martha a duty of care because the opening and closing of the doors was an open and obvious danger. We disagree, as did the trial court.

{¶ 27} The Supreme Court of Ohio summarized the case law on the open-and-obvious doctrine in the following manner:

> "Where a danger is open and obvious, a landowner owes no duty of care to individuals lawfully on the premises." *Armstrong v. Best Buy Co., Inc.*, 99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088, syllabus, approving and following *Sidle v. Humphrey* (1968), 13 Ohio St.2d 45, 42 O.O.2d 96, 233 N.E.2d 589. "[T]he owner or occupier may reasonably expect that persons entering the premises will discover those dangers and take appropriate measures to protect themselves." *Simmers v. Bentley Constr. Co.* (1992), 64 Ohio St.3d 642, 644, 597 N.E.2d 504. Thus, when a plaintiff is injured by an open and obvious danger, summary judgment is generally appropriate because the duty of care necessary to establish negligence does not exist as a matter of law. *Armstrong* at ¶ 14-15.

*Lang v. Holly Hill Motel, Inc.*, 122 Ohio St.3d 120, 2009-Ohio-2495, 909 N.E.2d 120., at ¶ 11.

{¶ 28} Although a commercial building with automatic sliding doors is very commonplace in today's society, common experience with these doors does not

suggest that they are likely to close on a person. To the contrary, most expect that these doors are equipped with safety mechanisms to prevent the door from closing on a person, to prevent injuries from occurring. For instance, these doors usually begin to close after a certain amount of time, but when someone or something enters the threshold, they cease closing and either remain in their position or reopen. Thus, we do not find that automatic sliding doors pose the open and obvious danger of closing on a person and causing injury so that an owner or occupier may reasonably expect that persons entering the premises will take appropriate measures to protect themselves.[2] Accordingly, the open-and-obvious doctrine does not apply in this case.

{¶ 29} For all of these reasons, the first assignment of error is sustained.

*First Assignment of Error*

{¶ 30} Randy contends in his first assignment of error that the trial court erred by failing to apply the doctrine of res ipsa loquitur to the premature closing of the automatic sliding doors. In contrast, the clinic asserts that this doctrine is inapplicable because the clinic did not have exclusive control over the automatic doors, and two or more equally probable causes exist for the injuries sustained by

---

[2] The dissent cites a number of cases, many of which are from courts in Michigan, in support of its position that the open-and-obvious doctrine should apply in this case. A review of those cases reveals that those decisions are inapposite to the case sub judice. In fact, most of those cases did not involve automatic *sliding* doors that retract to the sides, as is the case sub judice, but were automatic hinged doors. We find a distinct difference as to the open and obvious danger presented by automatic hinged doors, which need space to open and can actually open and hit a person who is in the path of the doors, and the type of doors at issue in this case, which do not present such dangers in their normal operation.

Martha.

**{¶ 31}** "The *res ipsa loquitur* doctrine is an evidentiary rule which permits, but does not require, an inference of negligence when the elements of the doctrine are shown." *Cochran v. Ohio Auto Club* (Oct. 3, 1996), 3d Dist. No. 9-96-33, 1996 WL 562055, citing *Morgan v. Children's Hosp.* (1985), 18 Ohio St.3d 185, 480 N.E.2d 464. Whether the doctrine of res ipsa loquitur applies is determined on a case-by-case basis. *Jennings Buick, Inc. v. Cincinnati* (1980), 63 Ohio St.2d 167, 171, 406 N.E.2d 1385.

> To warrant the application of the rule plaintiff must adduce evidence in support of two conclusions: (1) That the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed.

Id. at 170, citing *Hake v. George Wiedemann Brewing Co.* (1970), 23 Ohio St.2d 65, 66-67, 262 N.E.2d 703; *Fink v. New York Cent. RR. Co.* (1944), 144 Ohio St. 1, 56 N.E.2d 456. "*Res ipsa loquitur* does not apply where the facts are such that an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as if it was due to his negligence." *Cochran*, 3d Dist. No. 9-96-33, 1996 WL 562055, *4, citing *Greer v. Frazier-Williams Chevrolet-Oldsmobile, Inc.* (Apr. 3, 1991), 1st Dist. No. C-900242.

{¶ 32} Here, the clinic asserts that it did not have exclusive management and control of the door because it contracted with Stanley for the maintenance and inspection of the doors. The clinic also maintains that there are other efficient and probable causes of Martha's injury that are not attributable to the negligence of the clinic.

{¶ 33} As to the issue of exclusive management and control, Cole testified that the customer, such as the clinic, signs a contract for preventive maintenance with the company, and the contract terms provide how often maintenance will be performed. Further, the customer determines when maintenance will be performed. For instance, Cole testified that some customers request that the Stanley technician call before coming to the customer's location. Otherwise, the technician will simply go to the location and inquire of the customer whether "it's a good day for the inspection." Beyond preventive maintenance, the service provided by Stanley is at the request of the customer: "[W]e [Stanley] don't go somewhere we're not asked to go."

{¶ 34} Neddleton testified that the service contract with Stanley was for a yearly inspection of the doors and for any repairs or maintenance needed on the doors. If a repair was needed, the technician would provide a service ticket to Neddleton, who would either approve or not approve the repair. Then, any approved repairs would be performed by the technician. Beyond this, the clinic's maintenance department is not responsible for the maintenance of the doors but is

responsible for making sure that the doors operate safely at the beginning of each business day. In order to do this, a maintenance worker unlocks the doors[3] and turns them on at approximately 6:30 each morning. The worker then follows a checklist, which is located on the upper right-hand corner of the outside door frame. This procedure consists of allowing the doors to "cycle" and close, and then the worker walks through both sets of doors (beginning on the inside of the clinic, as the worker enters the clinic through an employee entrance) and back through them. This walk-through is done one time. However, this check does not include stopping in the threshold to determine whether the doors will close on the worker.

{¶ 35} A review of the evidence also reveals that Stanley conducted preventive maintenance in March and June 2003 and at that time, the threshold scan and/or safety beams were working properly and within ANSI standards.

{¶ 36} Martha was injured in April 2004, some ten months after this last service. During this time, the evidence reveals that the only people responsible for ensuring that the doors worked properly and safely were the employees in the clinic's maintenance department. While anyone entering and exiting the clinic was capable of activating the doors by merely entering the pathway of the sensors responsible for automatically opening the doors, the record is devoid of any

---

[3] Neddleton testified that security for the clinic locks the doors each night between 10:00 and 10:30.

evidence that the general public could manipulate the activity and/or sensitivity of the sensors either purposely or inadvertently or, more importantly, could make decisions about the timing of the sensors or the *closing* of the doors.[4]

{¶ 37} Further, the clinic exerted exclusive management and control over when these doors were accessible to the public by locking them at night and unlocking them in the morning. Neddleton also provided testimony as to what would happen if the doors did not function properly, such as shutting them down in the event that they malfunctioned or securing them in an open position if there was an operational problem. Thus, the evidence when viewed in a light most favorable to Randy indicates that the clinic had the sole power to determine when and if the public would have access to these doors.

{¶ 38} Moreover, as previously noted, the clinic determined what kind of doors it would have, what sensors it wanted on these doors, what company would maintain these doors, and when the doors would be serviced. Further, once the clinic knew of another incident similar to Martha's, it alone had the power to determine whether to have new sensors installed to accommodate the types of invitees that frequented its establishment or, if possible on the current sensors, to

---

[4] We find the cases cited by the clinic regarding public access to instrumentalities causing an invitee injury to be inapposite to the case sub judice. Rather, those cases involved situations wherein the public's access to these things could have as readily resulted in the injuries to the plaintiff as any act or omission by the defendant-business. See e.g., *Hansen v. Wal-Mart Stores*, 4th Dist. No. 07CA2990, 2008-Ohio-2477 (merchandise display was in location that customers could access and manipulate).

lengthen the amount of time before the doors would time-out or adjust the sensors that detected whether someone or something was in the pathway of the doors.

{¶ 39} For all of these reasons, we find that Randy presented sufficient evidence that *at the time of Martha's injury*, the doors were under the exclusive management and control of the clinic.

{¶ 40} Our inquiry does not end there, however. The next question is whether the injury occurred under such circumstances that in the ordinary course of events, it would not have occurred if ordinary care had been observed. Several courts have concluded that "[a]utomatic doors do not, in the ordinary course of things, cause injury to those who pass through them." *Brown v. Scrivner, Inc.* (1992), 241 Neb. 286, 488 N.W.2d 17, 19. See also *Rose v. Port of New York Auth.* (1972), 61 N.J. 129, 293 A.2d 371, 375 ("[m]embers of the public passing through automatic doors, whether in an airport, office building or supermarket do so generally, without sustaining injury. What happened to the plaintiff here is fortunately unusual and not commonplace. It strongly suggests a malfunction which in turn suggests neglect"; noted in Prosser & Keeton, Law of Torts (5th Ed.1984)); *Landmark Hotel & Casino, Inc. v. Moore* (1988), 104 Nev. 297, 757 P.2d 361, 364 ("[a]utomatic sliding glass doors * * * are ubiquitous, affording the public safe ingress and egress to countless facilities on a daily basis. What happened to Moore is unusual; it strongly suggests a malfunction attributable to

negligence"). But see *Hisey v. Cashway Supermarkets, Inc.* (1967), 77 N.M. 638, 426 P.2d 784.[5]

{¶ 41} We agree with those courts that have found that automatic doors do not ordinarily close on a person absent negligence. Nevertheless, the clinic maintains that there is more than one reasonable probable cause of the door's closing on Martha that is not attributable to the clinic's negligence: (1) the manufacturer's limit to a maximum of three minutes for the doors to remain open when Martha may have needed more time to traverse the doors, (2) poor design of the sensor that may not have "seen" Martha while she was standing in that area of the door; and (3) Martha's failure to position herself where the sensors could detect her or "to move quickly enough to have avoided the closing door."

{¶ 42} What the clinic fails to acknowledge is that none of these contentions alleviates its knowledge of the door's sensors and thus, its negligence in failing to address these issues. The clinic knew the make-up of its clientele. The clinic would be the party with the knowledge about what doors it used and what type of timing the sensors had. The clinic knew of another incident wherein a disabled invitee was injured when she did not "move quickly enough" to avoid being struck by the closing automatic doors. Yet the record is devoid of any evidence that the clinic did anything to obtain more sensitive sensors, lengthen the

---

[5] Once again the dissent relies on a number of cases that are factually distinguishable from the case sub judice to avoid application of the doctrine of res ipsa loquitor.

amount of time before the doors timed-out, if possible, or otherwise warn its disabled invitees to stay in the path of the sensors and/or "move quickly enough to avoid injury." Further, there is nothing in the record to show that Martha had acted in any negligent manner. Hayman's undisputed affidavit demonstrates that Martha merely attempted to walk through the doorway as one would ordinarily do, albeit slowly because she needed a cane to walk. Simply not having the agility to avoid being hit by a closing door does not amount to negligence. Therefore, we find that Martha was injured under such circumstances that in the ordinary course of events would not have occurred if *ordinary care* had been observed. Accordingly, the doctrine of res ipsa loquitur does apply, and the first assignment of error is sustained.

{¶ 43} For all of these reasons, the judgment of the Common Pleas Court of Marion County, Ohio, is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

ROGERS, J., concurs.

Preston, J., dissents.

_____

PRESTON, J., dissenting.

{¶ 44} The majority's opinion fails to hold Randy to his reciprocal burden under Civ.R. 56(E) to set forth facts showing a genuine issue for trial. As a result of this fundamental error, the majority opinion incorrectly concludes that a question of fact remains, fails to apply the open-and-obvious doctrine, and incorrectly applies the doctrine of res ipsa loquitur. Therefore, I respectfully dissent.

{¶ 45} The Smith Clinic moved for summary judgment primarily for two reasons: (1) that plaintiff failed to demonstrate a breach of duty and (2) that it owed Martha no duty of care since the automatic doors' *normal operation* was an open and obvious danger. In his response brief at trial *and on appeal*, Randy offered *no* argument regarding the application of the open-and-obvious doctrine to the normal operation of the automatic doors; rather, Randy argued that the doctrine of res ipsa loquitur applied and that evidence existed demonstrating a breach of the clinic's duty of care. In fact, the trial court noted Randy's lack of argument in its judgment entry: "Plaintiff did not address this issue in its response brief and therefore has not raised any genuine issue of material fact with regards to the operation of the open and obvious doctrine."

{¶ 46} Nevertheless, the majority concludes—with little analysis—that the open-and-obvious doctrine does not apply to the automatic doors in this case. Several courts have concluded otherwise when, like here, there is no evidence that the automatic doors malfunctioned. *Brown v. Pet Supplies Plus* (Aug. 26, 1999),

7th Dist. No. 98 CA 9; *Cassani v. Meijer, Inc.*, (Mich.Ct.App.2003), No. 240486, 2003 WL 1365919, at *1; *Rummel v. Henry Ford Health Sys.* (Mich.Ct.App.2007), No. 271563, 2007 WL 1791955, at *1. See also *Mann v. Tractor Supply Co.* (S.D.Ohio 2010), No. 2:08-cv-569, 2010 WL 1856312, at *4-5 (open-and-obvious doctrine does *not* apply when the automatic door malfunctions); *Horvath v. Fisher Foods, Inc.* (App.1963), 93 Ohio Law Abs. 182, 194 N.E.2d 452, 455 (question of fact concerning *abnormal* operation of automatic door); *Hoganson v. Menard, Inc.* (W.D.Mich.2007), No. 2:04-cv-299, 2007 WL 4395534 (same). The evidence in this case demonstrated that the automatic doors were inspected just months prior to Martha's accident and found to be working within ANSI safety standards. But for the accidents, there is simply a lack of evidence indicating a door malfunction in this case, and to avoid summary judgment, Randy was required under Civ.R. 56(E) to set forth specific facts indicating a malfunction. As an additional matter, the warning that Randy suggests should have been provided to patrons—"[d]on't stop on the threshold"— declares the open-and-obvious nature of the hazard upon ordinary inspection by a reasonable person.

{¶ 47} The majority also incorrectly concludes that a question of fact remains concerning a breach of duty. Like in *Gouhin v. Giant Eagle*, there was simply a lack of evidence in this case demonstrating a breach of duty. 10th Dist. No. 07AP-548, 2008-Ohio-766. Rich Cole's testimony concerning the operation

of the Stanley "Stan-Guard" sensor is irrelevant to show a breach of duty because the Smith Clinic's automatic doors were equipped with "Omni-Scan" sensors. When asked how Stan-Guard sensors differed from Omni-Scan sensors, Cole testified, "I don't know. I don't know what an OmniScan is or does. * * * [a]nd I had never heard of them before I saw it on the document here." When asked if Stan-Guard sensors were technologically superior to Omni-Scan sensors, Cole testified, "Not better, just different. I don't know that it was better or not, I don't know what the OmniScan was, what it did." In fact, the record indicates that Cole has never even seen the clinic's automatic doors or sensors. Despite Cole's lack of knowledge and his testimony that the clinic's OmniScan sensor *was* operating within ANSI safety standards, the majority concludes that the clinic's *ability* to replace the OmniScan sensors with better or additional safety sensors—including those not required by ANSI safety standards—demonstrates a breach of the clinic's duty.

{¶ 48} The majority's decision is even more troubling because, in practice, it requires business owners to install safety devices *beyond* those ANSI safety standards require—at least to avoid tort liability. For example, the majority suggests that the clinic should have installed a sensor that would have held the doors open when someone/something was in the door's path and immobile. This would have probably required that the clinic install a "holding beam," which Cole testified that ANSI safety standards did not require at that time. The Smith Clinic

could have reasonably relied upon Stanley Door's conclusion that their automatic doors were compliant with ANSI safety standards. Reliance upon these national standards provides businesses with guidance in maintaining safe automatic doors. The majority's opinion undermines this guidance and reliance. The majority has inappropriately replaced ANSI safety standards with its own.

{¶ 49} The majority also errs in concluding that the doctrine of res ipsa loquitur applies in this case. Again, Randy has failed to meet *his burden* to "adduce evidence" in support of the doctrine's two required conclusions. *Jennings Buick, Inc. v. Cincinnati* (1980), 63 Ohio St.2d 167, 171, 406 N.E.2d 1385. In his response to the clinic's motion for summary judgment, Randy merely *alleged*: "There should be no dispute * * * that at the time of the injury * * * the sliding glass doors to the main entrance to the Fredrick C. Smith Clinic was under the exclusive management and control of the defendant." Likewise, on appeal, Randy failed to point to any evidence in the record upon which a rational trier of fact could conclude that the automatic doors were in the clinic's exclusive management and control. In fact, Randy mistakenly asserted: "It is unrefuted that Defendant Clinic had exclusive management and control of the automatic sliding doors during the time in question." The clinic, both in its reply brief in the trial court and in its appellate brief, strongly refuted that the automatic doors were in their exclusive control and management. Further, Randy has filed no reply brief with this court. Aside from that, the doctrine is inapplicable here because the

evidence affirmatively demonstrated that the accident *could have* occurred even if the OmniScan sensor was functioning properly and the doors were equipped with holding beams.

{¶ 50} Furthermore, the Court of Appeals in Ohio has rejected the application of the doctrine, finding that the business owners did not have exclusive management and control of the automatic doors since patrons control the doors' operation. *Knox v. Bag-N-Save Foods* (Apr. 8, 1999), 5th Dist. No. 1998AP080100, at *3; *Lewis v. Newburg Supermarket* (Sept. 24, 1998), 8th Dist. No. 73238, at *4. See also *Farina v. First Natl. Bank* (1943), 72 Ohio App. 109, 51 N.E.2d 36 (manual revolving bank door). One district in Ohio found the doctrine applicable where the evidence affirmatively demonstrated "that automatic doors, when properly operating, do not close on people." *Musial v. Tamarkin Co.* (Sept. 1, 1994), 7th Dist. No. 93 C.A. 40, at *1. Cole's testimony here was exactly the opposite. The majority ignores these Ohio decisions, and instead, relies upon cases from other states to reach its decision.

{¶ 51} For all these reasons, I respectfully dissent. I would overrule the assignments of error and affirm the trial court's grant of summary judgment.